## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## FILE NO. 1:20-cv-00187

DR. SALMAN AZHAR,

        Plaintiff,

v.

DUKE UNIVERSITY,

        Defendant.

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

Now comes Plaintiff Dr. Salman Azhar ("Dr. Azhar") bringing this action against Duke University, ("Duke"), and alleges as follows:

## INTRODUCTION AND NATURE OF ACTION

1.      Duke discriminated against Dr. Azhar when it placed him on administrative leave, banned him from Duke campus, and fired him based on ugly and pernicious stereotypes that Arab men are angry, misogynist, and dangerous.

2.      Dr. Azhar, who spent over two decades working as a well-regarded professional in the highly competitive field of entrepreneurship and investor relations, was recruited by Duke to boost its entrepreneurial programs and later manage its angel investor relations.

3.      After one exchange on his personal Facebook page referencing the mentoring of women, Dr. Azhar's supervisor and co-worker stated that his ethnicity and culture made him inherently biased to women. Two weeks after Dr. Azhar reported this discriminatory behavior, Duke unexpectedly and without basis, forced Dr. Azhar on administrative leave.

1

4.      Not long after Dr. Azhar complained about the discriminatory conduct and the baseless imposition of leave, Duke fired him. At no time has Duke been able to point to a single university policy that Dr. Azhar allegedly violated that would support his sudden termination.

5.      Adding insult to injury, Duke willfully refused to pay Dr. Azhar the guaranteed bonus that he rightfully earned collecting more fee-paying members to a Duke sponsored organization.

6.      Dr. Jon Fjeld ("Dr. Fjeld"), Dr. Azhar's supervisor, falsely told third parties that Dr. Azhar had "H.R. and legal problems," impugning Dr. Azhar's professional character for honesty and integrity.

7.      As a result of the unexplained leave, termination, and false statements about Dr. Azhar's employment with Duke, Dr. Azhar lost employment opportunities with private companies and academia.

8.      Dr. Azhar's once untarnished reputation is now in shatters, and he is utterly humiliated by Duke's conduct.

## THE PARTIES

9.      Dr. Azhar is an Arab-American Muslim man of Middle Eastern descent.

10.     Dr. Azhar lives in Durham, North Carolina, and is a resident and a citizen of the United States.

11.     Dr. Azhar was employed by Duke's Angel Network ("D.A.N.") in Duke's Innovation and Entrepreneurship Initiative ("I&E") program from Apr. 15, 2018 until Jun. 30, 2019.

12.     Defendant Duke University is a private, tax-exempt, non-profit university with its principal place of business in Durham, North Carolina.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. 1331 and 1343, this Court possesses original jurisdiction over Plaintiff's federal claims arising under 42 U.S.C. § 1981.

14.     This Court possesses supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the Plaintiff's state law claims are so related to the claims in the action that they form part of the same case or controversy under Article III of the United States Constitution, making them within the Court's original jurisdiction.

15.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b)-(c) because it is the judicial district in which the Defendant resides as well as the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTS

### Dr. Azhar's Professional History with Duke

16.     Dr. Azhar graduated from Duke in 1994 with a Ph.D. in Computer Science.

17. Since obtaining his Ph.D., Dr. Azhar has spent over twenty-five (25) years working as a highly compensated professional in the technology, innovation, and entrepreneurial fields.

18. From 2014 to the present, Duke employed Dr. Azhar as a faculty member in computer science, technology, entrepreneurship, and business subjects.

19. From 2016 to 2019, Duke employed Dr. Azhar to lead the instruction of graduate and undergraduate courses for the "Duke in Silicon Valley" program. This strategic initiative for Duke was for the purpose of developing programs in California, obtain California-based investors for Duke-related ventures, and promoting Duke University's business interests in Silicon Valley.

20. Dr. Azhar has spent his entire professional life creating a reputation for honesty and integrity, which was essential to his success as an entrepreneur, investor, executive, board member, coach, and other professional roles.

21. In April 2018, Duke offered Dr. Azhar a position as Managing Director of D.A.N. in Duke's I&E program. In this role, Dr. Azhar was tasked with bringing fee-paying members to D.A.N., supervising investor relations, and spearheading investment strategy.

22. Duke promised to pay Dr. Azhar $161,000 as an annual salary and a guaranteed bonus based on the number of investors who became members in D.A.N. that year. The bonus would be calculated by applying the following formula: "0.5 x total angel fee for the first one hundred and twenty (120) angels for a total bonus potential of $60,000" for one year. (See, Exhibit 1, 2018 04 24 Duke's Offer Letter to Dr. Azhar, attached and incorporated herein). Membership fees for annual angel investors were $1,000 for the year.

4

Put another way, if Dr. Azhar secured 120 paying members to DAN in twelve months, Duke promised to pay him $60,000.

23.     Dr. Azhar accepted the salaried plus bonus position on Apr. 26, 2018.

24.     As the Managing Director of the DAN program, Dr. Azhar managed investments of over ten million dollars.

25.     At no time during his tenure at Duke was Dr. Azhar given a negative performance evaluation or placed on a performance improvement plan.

26.     By Feb. 25, 2019, Dr. Azhar had secured a total of one hundred and fifty-three (153) investors, thereby meeting and exceeding his bonus formula goal for the year.

**Dr. Azhar's Personal Facebook Post and Duke's Discriminatory Response**

27.     In November 2018, Duke hired Dr. Sharlini Sankaran ("Dr. Sankaran"), as the I&E's Director of Translational Programs.

28.     Early in Dr. Sankaran's tenure, Dr. Azhar believed that he and Dr. Sankaran had a good working relationship at D.A.N.

29.     In January 2019, Dr. Sankaran requested Dr. Azhar to add her as a "friend" on his personal Facebook page.  Dr. Azhar accepted the request.

30.     On Jan. 28, 2019, Dr. Azhar posted a link on his personal Facebook page to a New York Times article about hesitations some men felt having close mentoring relationships with women in the #MeToo era. (See Katrin Bennhold, *Another Side of #MeToo: Male Managers Fearful of Mentoring Wome*n, NY TIMES (Jan. 27, 2019),

5

https://www.nytimes.com/2019/01/27/world/europe/metoo-backlash-gender-equality-davos-men.html).

31.     On Jan. 28, 2019, Dr. Sankaran posted a statement on Dr. Azhar's personal Facebook, indicating that she was disappointed that Dr. Azar did not want to mentor women. Dr. Azhar responded that he had not refused to mentor any woman who asked for mentoring and that he would like to discuss the issue further.

32.     On Jan. 28, 2019, Dr. Azhar posted on his Facebook page an apology for the impression that he did not want to mentor women. Dr. Azhar clarified that he considers himself an ally for women.

33.     On or about Feb. 1, 2019, Dr. Fjeld announced that Duke had named him permanent Director of I&E.

34.     On Feb. 5, 2019, Dr. Fjeld informed Dr. Azhar that Dr. Sankaran made a gender bias complaint against Dr. Azhar. Dr. Sankaran's complaint was entirely based on the New York Times article that Dr. Azhar linked on his personal Facebook page.

35.     At no time in his career, before this allegation, had any complaints of discrimination been made against Dr. Azhar.

36.     During the week of Feb. 5, 2019, Dr. Azhar met with female co-workers Camille Warren, Alice Smith, Andrea Yackenovich, Megan Deyncourt, and Dr. Sankaran to discuss complaints of gender bias in the workplace.

37.     Mses. Warren, Smith, Yackenovich, and Deyncourt told Dr. Azhar that he was a professional and collegial co-worker who showed no discriminatory animus towards them. Several of them noted that Dr. Azhar had created opportunities for them.

6

38.     On Feb. 7, 2019, during a conversation with Dr. Sankaran about her complaint, Dr. Sankaran accused Dr. Azhar of being inherently misogynist because of his actual or perceived race, color, and ethnicity.

39.     Dr. Azhar was personally offended by Dr. Sankaran's stereotypical and discriminatory comment referencing Dr. Azhar's actual or perceived race, color, and ethnicity.

40.     On Feb. 11, 2019, Dr. Azhar reported to Dr. Fjeld that Dr. Sankaran made offensive comments about his actual or perceived race, color, and ethnicity during their Feb. 7, 2019 meeting.

41.     On Feb. 12, 2019, Dr. Fjeld met with Dr. Azhar and discussed Dr. Sankaran's concern about the article linked on Facebook.

42.     During the Feb. 12 meeting, Dr. Fjeld and Dr. Azhar discussed Dr. Azhar's history of mentoring women and his pledge to continue mentoring women.  During this meeting, Dr. Azhar confirmed that Dr. Sankaran made offensive statements about his actual or perceived race, color, and ethnicity on Feb. 7, 2019.

43.     Dr. Antwan Lofton ("Dr. Lofton") is the Assistant Vice President of Staff and Labor Relations ("Labor Relations") at Duke. Upon information and belief, Dr. Lofton had the responsibility for conducting investigations around discrimination complaints at DAN.  Dr. Lofton told Dr. Azhar he investigated Dr. Sankaran's complaint by reviewing the Facebook article and interviewing her and other co-workers.

44.     On Feb. 18, 2019, Dr. Lofton told Dr. Azhar that after his investigation, he concluded that Dr. Azhar did not violate any Duke policies. Dr. Lofton then asked Dr.

7

Azhar to attend a meeting with him and Dr. Sankaran on Feb. 25, 2019. Dr. Lofton assured Dr. Azhar that Dr. Sankaran harbored no hard feelings towards him and that the meeting should resolve any remaining tensions.

## Duke's Discriminatory and Defamatory Acts:
## Duke's Banning of Dr. Azhar From Responsibilities and Campus

45.     On Feb. 19, 2019, Dr. Azhar met with Dr. Fjeld and reported Dr. Lofton's conclusion that Dr. Azhar had not violated any Duke policies.

46.     Dr. Fjeld spent much of the meeting berating Dr. Azhar and accusing him of having a "cultural bias" against women. Dr. Azhar was personally offended by Dr. Fjeld's stereotypical and discriminatory comments referencing Dr. Azhar's actual or perceived race, color, and ethnicity.

47.     Dr. Fjeld acknowledged that Dr. Azhar made a complaint of discrimination but appeared annoyed and frustrated that Dr. Azhar made the complaint.

48.     During the same conversation, Dr. Fjeld asserted that "H.R. should not have cleared you (Dr. Azhar) without my (Dr. Fjeld's) permission." Upon information and belief, Dr. Fjeld did not conduct an independent investigation regarding Dr. Azhar's Facebook post.

49.     On Feb. 25, 2019, Dr. Azhar went to a meeting that Dr. Lofton told him would be between himself, Dr. Lofton, and Dr. Sankaran to resolve any remaining tensions among the parties.

50.     When Dr. Azhar arrived at the Feb. 25 meeting, he noticed that Dr. Lofton was present, but Dr. Fjeld attended instead of Dr. Sankaran. Dr. Fjeld then informed Dr.

8

Azhar that the meeting was about Dr. Fjeld's decision to place Dr. Azhar on administrative leave effective immediately.

51.    The notification to Dr. Azhar that he was being placed on administrative leave occurred approximately two (2) weeks after Dr. Azhar first complained to Dr. Fjeld of a co-worker's offensive and stereotyping statements about his actual or perceived race, color, and ethnicity and approximately one (1) week after Dr. Fjeld's offensive and stereotyping statements to Dr. Azhar.

52.    Dr. Azhar was stunned at this announcement because he had never received any unsatisfactory performance reviews from Duke in his position at D.A.N.

53.    Dr. Fjeld explained that, as part of the administrative leave, Dr. Fjeld would assume all responsibility for managing D.A.N. Dr. Fjeld then forbade Dr. Azhar from communicating with any Teaching Assistants, students, and D.A.N. investors.  Dr. Fjeld also informed Dr. Azhar that he was physically and indefinitely barred from Duke's campus.

54.    According to Duke's policies, a disciplinary "suspension" is appropriate in cases of serious misconduct or "to protect the safety and security of the workplace." An investigatory suspension may be appropriate while the "supervisor is considering termination." (See, Exhibit 2, Duke's Standards of Conduct & Performance/Corrective Action Policy, attached and incorporated herein).

55.    At the meeting, Dr. Lofton repeatedly stated that Dr. Azhar's administrative leave was not a disciplinary action. Dr. Lofton did not state that Dr. Fjeld was considering terminating Dr. Azhar.

56.     Upon information and belief, Dr. Fjeld has not suspended or placed on administrative leave  Caucasian employees who report to him.

57.     Upon information and belief, Dr. Fjeld has not banned any Caucasians employees who report ot who from appearing on campus or from communicating with students, Teaching Assistants, or investors.

58.     Dr. Fjeld placed him on leave and banned him from campus because of Dr. Fjeld's discriminatory animus towards Dr. Azhar and in retaliation for Dr. Azhar's complaint of discrimination.

59.     Dr. Fjeld's improperly imposed immediate administrative leave dramatically and negatively impacted Dr. Azhar's personal and professional life.  For example,

    a.     Dr. Azhar was not able to attend religious services on Duke's campus despite his specific request to Dr. Fjeld for permission to attend services.

    b.     Dr. Azhar was unable to go to Duke's Center for Muslim Life and fufill his responsibilities as a Board member of the Duke Muslim Alumni Association.

    c.     As part of the ban, Dr. Azhar was unable to receive medical care from his medical service providers at Duke;

    d.     Anxious D.A.N. members, investment partners, strategic partners, deal flow sources, and investors expressed their concerns over his sudden lack of responsiveness and availability given their current and pending investments.

    e.     Several investors told Dr. Azhar that his refusal to communicate with them contributed to their decision not to invest with DAN or with any future projects associated with Dr. Azhar.

10

f. Dr. Azhar was absent without explanation from two classes. Because of the prohibition on speaking to students or Teaching Assistants, Dr. Azhar suffered poor teaching evaluations. For example, in his Computer Science class, Dr. Azhar's instructor ratings fell from 4.41/5 to 3.47/5 down twenty-seven percent (27%).

60. Dr. Fjeld's radical decision to exile Dr. Azhar based on Dr. Fjeld's assertion that a Facebook post about men mentoring women created an "appearance of a violation" demonstrates his underlying belief in stereotypes of Arab-Americans being misogynist and dangerous.

61. During March 2019 and into April 2019, Dr. Azhar had several phone conferences and email exchanges with Dr. Fjeld and Dr. Lofton to discuss the unjustified administrative leave and Dr. Azhar's request to return to his position in an active role.

62. During this time, both Drs. Fjeld and Lofton assured Dr. Azhar that his administrative leave was not disciplinary, yet they failed to point to any Duke policy or process that would justify his sudden and lengthy absence.

63. Dr. Azhar promptly communicated to Dr. Fjeld that students, Teaching Assistants, colleagues, and investors were losing faith in him due to his sudden unexplained absence. Dr. Azhar asked Dr. Fjeld to work with investors to manage the D.A.N. program in a way that eased investor's anxiety about Dr. Azhar's unexpected absence.

64. Unfortunately, Dr. Fjeld failed to manage the D.A.N. program in a way that increased investor's anxiety about Dr. Azhar's unexplained absence. Further, Dr. Fjeld maliciously spread lies to others that Dr. Azhar had "H.R. and legal issues" at Duke.

65.     Within the scope of his employment as the Director of D.A.N., Dr. Fjeld maliciously, knowingly, and untruthfully told third parties, including some prospective D.A.N. investors that:

    a.   Dr. Azhar had "H.R./legal issues,"

    b.   Dr. Azhar had "committed H.R. violations," and that

    c.   Dr. Azhar voluntarily "stepped away" from D.A.N. and "had taken a leave of absence" from his position

(See, Exhibit 3, 2019 04 23 Email thread with Jon Fjeld, Nicholas Zaldastani and Kate Hendricks, attached and incorporated herein).

66.     Kate Hendricks, Deputy General Counsel for Labor and Employment at Duke, was included on the April 04, 2019 email referenced above. Upon information and belief, Ms. Hendricks knew of Dr. Fjeld's communication to others that Dr. Azhar had "HR and legal issues" and did not correct the untruthful publications to others.

67.     Dr. Fjeld knew of Dr. Azhar's prospective employment opportunity with members of the venture capitalist community, such as David Frazee of Richmond Global Ventures. Upon information and belief, Dr. Fjeld told Mr. Frazee that Dr. Azhar had serious "H.R. and legal issues" and that those issues caused him to be removed from the organization.

68.     Mr. Frazee emailed Dr. Azhar that "[he] would use [his] network to ensure you never work on anything related to any company [in Silicon Valley] again." (See,

Exhibit 4, 2019 04 12 Email from David Frazee to Dr. Azhar, attached and incorporated herein).

69.     Directly as a result of Dr. Fjeld's untruthful communications about him, Dr. Azhar's professional reputation in the investment and professional world was severely maligned.

70.     As a result of the reputational damage caused by Dr. Fjeld's untruthful statements, Dr. Azhar has limited prospects for future opportunities and compensation as a professional, especially within the areas of entrepreneurship, innovation, and investments.

71.     Dr Fjeld's untruthful statements also harmed Dr. Azhar's academic career at Duke. Despite being highly qualified for several academic appointments, Duke has either rejected or provided no response for four (4) applications that Dr. Azhar submitted for faculty positions with no explanation for the rejections and unresponsiveness. Senior leaders who previously supported Dr. Azhar at Duke did not respond to his inquiries for available positions.

72.     Dr. Azhar's current academic position will end in June 2020, and he does not have an offer from Duke to continue employment in any capacity with the university.

73.     Dr. Azhar experienced severe anxiety due to his inability to speak his students, Teaching Assistants, colleagues, and business partners about his lengthy and unexplained absence.

74.     Dr. Azhar experienced physical symptoms associated with his anxiety, such as sleeplessness, heart-racing sensations, and headaches.

**Duke's Retaliatory Acts: Termination of Dr. Azhar**

75.     On Mar. 1, 2019, Dr. Azhar made a formal complaint of discrimination and retaliation to Cynthia Clinton ("Ms. Clinton"), Assistant Vice President, Harassment & Discrimination Prevention and Compliance in Duke's Office of Institutional Equity ("O.I.E."). During a lengthy conversation, Dr. Azhar described the discriminatory statements made by Dr. Sankaran, Dr. Fjeld's decision to place him on administrative leave and bar him from campus, Dr. Azhar's subsequent loss of job responsibilities, and Dr. Azhar's inability to communicate with Duke staff and colleagues due to the improper administrative leave.

76.     On March 28, 2019, Dr. Azhar met with Dr. Fjeld and Dr. Lofton.

77.     During the meeting, Dr. Fjeld indicated that Dr. Lofton would offer Dr. Azhar a separation agreement, including severance pay if Dr. Azhar voluntarily resigned. Dr. Fjeld indicated that if Dr. Azhar refused the offer that Dr. Fjeld would terminate him.

78.     When Dr. Azhar asked Dr. Fjeld to identify the basis for the termination, he directed Dr. Azhar to speak to Dr. Lofton and abruptly left the room.

79.     When Dr. Azhar asked Dr. Lofton the basis for the termination, Dr. Lofton confessed that he did not know of Dr. Fjeld's plans to terminate Dr. Azhar, nor did he know the basis for the termination.

80.     Despite repeated requests, Duke has still not provided Dr. Azhar a basis for the termination.

81.     On April 8, 2019, Dr. Azhar reported the discrimination and retaliation to Ms. Clinton. Dr. Azhar emailed Ms. Clinton and informed her of Dr. Fjeld's threat to

14

terminate him. He sought her assistance to investigate the matter, including the basis for the ongoing administrative leave.

82.     On April 10, 2019, Dr. Lofton sent Dr. Azhar a letter from Dr. Fjeld notifying Dr. Azhar that his appointment as Managing Director of the Duke Angel Network will expire on June 30, 2019 and will not be renewed.

83.     Dr. Azhar was surprised and confused by this email because Duke did not employ him under a renewable contract but rather as an employee for no particular duration. Furthermore, Dr. Azhar's termination did not follow the process consistent with the termination process applied to other Duke employees. (See Exhibit 5, Leaving Duke (Voluntary and Involuntary) Policy, attached and incorporated herein).

84.     Upon information and belief, OIE did not oppose Dr. Azhar's June 30, 2019 termination.

85.     On April 15, 2019, Ms. Clinton sent an email to Dr. Azhar which untruthfully asserted that she and Dr. Azhar had not engaged in a telephone conversation discussing his concerns, despite the fact they spoke at length on March 1, 2019, and had an email exchange on April 8.  Ms. Clinton then informed Dr. Azhar that Duke was not going to investigate his complaint.

86.     Dr. Azhar emailed Ms. Clinton on April 23, 2019, with another request for an investigation of his claims of discrimination and retaliation. Upon information and belief, Duke has failed to investigate Dr. Azhar's discrimination and retaliation claims.

87.     To date, Duke has provided no basis for their decision to terminate Dr. Azhar.

88.     As of the date of this filing, Duke has not paid Dr. Azhar the $60,000.00 that he is entitled to under the terms of Duke's compensation promise to him.

89.     Dr. Azhar experienced emotional and physical symptoms related to the distress he experienced from Duke's unlawful termination of him from DAN

## CLAIMS

### FIRST CLAIM FOR RELIEF: DISCRIMINATION ON THE BASIS OF RACE, COLOR, AND/OR ETHNICITY- (42 U.S.C. § 1981)

90.     Paragraphs 1 through 89 are re-alleged and incorporated by reference by Dr. Azhar.

91.     Dr. Azhar is an Arab-American man, a class of persons protected under 42 U.S.C. § 1981.

92.     Defendant Duke and its agents placed Dr. Azhar on administrative leave and terminated Dr. Azhar.

93.     Dr. Azhar was satisfactorily performing his role at the time of the adverse employment actions taken against him.

94.     Duke has not stated any reasons for taking adverse employment actions against Dr. Azhar.

95.     The real reason Duke took adverse employment action against Dr. Azhar was because of his actual or perceived race, color, and ethnicity.

96.     Dr. Azhar's actual or perceived race, color, and ethnicity was both a motivating and determinative factor in the issuance of the suspension and the subsequent termination.

16

97.     Duke's racially and ethnically discriminatory conduct violates Dr. Azhar's rights under 42 U.S.C. § 1981.

98.     Duke did not terminate Caucasian employees in DAN without explanation or reason.

99.     The conduct, acts, and omissions of Duke constitute malicious, willful, and wanton conduct or are in reckless disregard and indifference to Dr. Azhar's rights.

100.    As a direct proximate cause and consequence of Duke's wrongful actions, Dr. Azhar suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career-enhancing and advancement opportunities and loss of retirement savings and benefits. Dr. Azhar has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Duke or its agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial hardship.

101.    Dr. Azhar has suffered economic and non-economic damages in an amount to be proven at trial and seeks make-whole relief, including back pay, reinstatement or front pay, compensatory damages, attorneys' fees and costs of suit.

**SECOND CLAIM FOR RELIEF: RETALIATION ON THE BASIS OF RACE, COLOR AND/OR ETHNICITY- (42 U.S.C. § 1981)**

102.    Paragraphs 1 through 101 are re-alleged and incorporated by reference by Dr. Azhar.

103.    Dr. Azhar is an Arab-American man, a class of persons protected under 42 U.S.C. § 1981. Dr. Azhar engaged in protected activity under 42 U.S.C. § 1981 when he reported racial and ethnic harassment and discrimination to Dr. Fjeld and Duke's OIE.

104.    Dr. Azhar suffered materially adverse employment action in the form of an administrative leave shortly after he reported to Dr. Fjeld the details of Dr. Sankaran's discriminatory conduct towards him.

105.    Dr. Azhar suffered materially adverse employment action in the form of termination shortly after he reported the discriminatory conduct of Dr. Fjeld and Dr. Sankaran to the OIE.

106.    Dr. Azhar's protected activity was a motivating and determinative factor in the adverse action taken against him by Duke and its agents.

107.    The conduct, acts, and omissions of Duke, constitute malicious, willful and wanton conduct or are in reckless disregard and indifference to Dr. Azhar's rights.

108.    As a direct proximate cause and consequence of Duke's wrongful actions, Dr. Azhar suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career-enhancing and advancement opportunities and loss of retirement savings and benefits. Dr. Azhar has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Duke or its agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and resultant financial hardship.

109.    As a result, Dr. Azhar has suffered economic and non-economic damages in an amount to be proven at trial, and seeks make-whole relief including back pay, reinstatement or front pay, compensatory damages, attorneys' fees and costs of suit.

## THIRD CLAIM FOR RELIEF: NORTH CAROLINA WAGE AND HOUR ACT- (N.C. GEN. STAT. § 95-25.7)

110.    Paragraphs 1 through 109 are re-alleged and incorporated by reference by Dr. Azhar.

111.    Dr. Azhar was entitled to a bonus of $60,000.00 based on the formula of "0.5 x total angel fee for the first one hundred and twenty (120) angels for a total bonus potential" with a cap of $60,000.00. Dr. Azhar met the conditions precedent to receive the guaranteed bonus by brining one hundred and fifty-three (153) investors to DAN.

112.    Under the North Carolina Wage and Hour Act, a bonus payment is a form of wages.

113.    Before his suspension, Dr. Azhar achieved this goal, but Duke knowingly and willfully refused to pay him the bonus payment to which he was entitled.

114.    Duke violated the North Carolina Wage and Hour Act when it refused to pay Dr. Azhar wages owed him on the next regular pay date after his separation of employment with Duke.

115.    As a direct and proximate result of Duke's unlawful and willful conduct in violation of the North Carolina Wage and Hour Act, Dr. Azhar is entitled to recover damages from the Duke for $60,000.00 plus the legal rate of interest from the date each payment first came due; liquidated (double) damages in an amount equal to all unpaid and

past-due wages; and reimbursement for all expenses of this lawsuit, including all costs and attorney's fees.

## FOURTH CLAIM FOR RELIEF: SLANDER PER SE

116.　Paragraphs 1 through 115 are re-alleged and incorporated by reference.

117.　At all times set out herein, Dr. Fjeld acted within the scope of his employment and as Duke's agent.

118.　Dr. Fjeld maliciously and knowingly made false statements to third parties that: i) Dr. Azhar had "HR and legal issues," ii) Dr. Azhar was suspended for a violation of Duke's policies; and iii) Dr. Azhar willfully left his position at DAN and purposefully neglected his duties at DAN.

119.　Dr. Fjeld's statements were malicious in that they were made with the intent to harm Dr. Azhar and in bad faith.

120.　Dr. Fjeld's false statements to third parties are slander *per* se in that impeached Dr. Azhar's professional reputation for honesty and integrity and held him up to disgrace, ridicule, and contempt.

121.　Dr. Fjeld's *per se* defamatory statements plainly and directly maligned his reputation for honesty and integrity and impeached Dr. Azhar is his profession thereby making malice and damages deemed presumed by proof of publication.

122.　Duke is responsible for the conduct of its managers and employees, such as Dr. Fjeld, under the doctrine of <u>respondeat superior</u>.

123.    Duke is liable for the slanderous actions of Dr. Fjeld in that Duke had actual or constructive knowledge of the behavior, directed approved of or failed to take adequate action to stop such behavior, and thereby ratified such behavior.

124.    Duke acted wantonly, willfully, and in disregard of the protected rights of Plaintiffs.

125.    Dr. Azhar is entitled to actual, compensatory, and punitive damages as a consequence of the Defendant's slanderous actions.

126.    In the alternative, Dr. Azhar has been proximately injured as a result of Duke's actions and has lost prospective earnings by having his professional reputation harmed by Duke's false statements.

127.    As a direct and proximate cause of the defamation, Dr. Azhar has incurred substantial damages in the form of embarrassment, public humiliation, and irreparable damage to his name and professional reputation. Dr. Azhar is entitled to an award of compensatory and punitive damages for the irreparable damages to his reputation.

### FIFTH CLAIM FOR RELIEF: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (N.C. Gen. Stat. 143-422.1)

128.    Paragraphs 1 through 127 are re-alleged and incorporated by reference by Dr. Azhar.

129.    Dr. Azhar was an at-will employee of Duke.

130.    Dr. Azhar is an Arab-American man.

131.    Dr. Azhar was placed on administrative leave and discharged from his position because of his actual or perceived race, color, and ethnicity.

132. The North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.1 et seq., ("NCEEPA") makes discrimination in employment on account of race an unlawful practice in North Carolina.

133. The adverse employment actions were taken by Duke, including the termination of Plaintiff from his position as Managing Director of DAN, violated the public policy of the State of North Carolina, as set out in NCEEPA.

134. Duke's intentional and wrongful termination caused Dr. Azhar to suffer significant wage and benefits loss, humiliation, indignation, frustration, and mental anguish.

135. Dr. Azhar has suffered damages, including lost wages and benefits, in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

136. Paragraphs 1 through 135 are re-alleged and incorporated by reference by Dr. Azhar.

137. Defendant prevented Dr. Azhar from participating in profound expressions of his personal life such as practice his faith, receiving medical care from his regular medical providers, and communicating with his students.

138. Without justification, Duke prevented Dr. Azhar from practicing his profession and communicating with his colleagues and business partners.

139. Dr. Azhar was humiliated by the false statement to others at Duke that Dr. Azhar had "HR and Legal issues,"

140. The Defendant engaged in extreme and outrageous conduct as set out in the paragraphs above.

141. The Defendant, by and through its agent, intended to cause severe emotional distress; or acted in a way that indicates a reckless indifference to the likelihood that such conduct will cause severe emotional distress.

142. As a directed and intended result of the actions of Duke, Dr. Azhar suffered severe and emotional distress.

143. As a direct and proximate cause of the infliction of emotional distress, Dr. Azhar has incurred substantial compensatory and punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Azhar requests this Court to enter judgment in his favor and against Duke as follows:

a. Declare the conduct by Duke violated Dr. Azhar's statutory rights and common law rights.

b. Award Dr. Azhar back pay, and compensatory damages for his losses from the date of his wrongful termination until the date of any judgment, and front pay into the future.

c. Award Dr. Azhar sufficient funds to compensate him for his losses, pain and mental suffering, which cannot otherwise be compensated by any equitable relief.

d.      Award Dr. Azhar compensatory and punitive damages not otherwise specified herein.

e.      Award Dr. Azhar any and all liquidated damages, which would make the plaintiff "whole."

f.      Award Dr. Azhar attorney's fees, and the cost of this action, pre-judgment and post-judgment interest.

g.      Award Dr. Azhar such other and further relief as this Court deems just and proper.

Respectfully submitted this 25th day of February, 2020.

**THE NOBLE LAW FIRM, PLLC**

*/s/ Laura L. Noble*
Laura L. Noble, Esq. (N.C. Bar No. 38691)
141 Providence Road, Suite 210
Chapel Hill, N.C. 27514
Telephone:    (919) 251-6008
Facsimile:    (919) 869-2079
lnoble@thenoblelaw.com
*Attorneys for Plaintiff*

24